UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEONARD VISCITO, | * |
| | * |
| Plaintiff, | * |
| v. | * |
| | *  Civil Action No. 18-30132-MGM |
| NATIONAL PLANNING CORPORATION | * |
| JOHN JOHNSON, MAURA COLLINS, AND | * |
| JOHN AND/OR JANE DOES, | * |
| | * |
| Defendants. | * |

MEMORANDUM AND ORDER REGARDING
CROSS MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 137 and 140)

January 22, 2021

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Plaintiff, Leonard Viscito, is a financial advisor registered with FINRA to sell securities and licensed to sell insurance products in several states, including Massachusetts and Florida. Between 2013 and 2017 he was an investment adviser representative affiliated with the corporate defendant, National Planning Corporation ("NPC"). Plaintiff brings this suit against NPC and two of its executives, John Johnson and Maura Collins, (collectively "Defendants"), asserting that, under the Massachusetts Wage Act (MWA), he was an employee of NPC in Massachusetts and is, therefore, entitled to damages under the MWA because NPC treated him as an independent contractor, not an employee. He has also asserted claims under the Fair Labor Standards Act and Massachusetts law. Before the court are Plaintiff's Motion for Partial Summary Judgment with respect to his claims

under the MWA and Defendants' Motion for Summary Judgement as to all claims. For the reasons set forth below, the court will deny Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 137) and grant Defendants' Motion for Summary Judgment (Dkt. No. 140).

## II. BACKGROUND

Plaintiff is a CPA, FINRA-registered broker dealer Registered Representative, SEC-registered Investment Advisor Representative, certified wealth strategist, and certified fund specialist. He also holds insurance licenses from Massachusetts, Connecticut, and Florida. In 1997, Plaintiff began operating Viscito Financial Services ("VFS") in Springfield, Massachusetts. VFS has a number of employees and operates out of office space in Springfield, Massachusetts. Plaintiff maintains approximately 250 client relationships through VFS, most of which were established prior to his affiliation with NPC. FINRA rules and SEC regulations require Plaintiff to sell securities and provide investment advisory services only through a registered broker-dealer and investment advisor. Over the years, Plaintiff has associated VFS with several different registered broker-dealer/investment advisors, including Mutual Service Corporation (2003-2009), Allied Securities (2009-2013), NPC (2013-2017), and LPL Financial (2017-present). The clients served by VFS have stayed with VFS through these broker-dealer changes, each time agreeing to transfer their accounts to the new broker dealer. In addition to providing financial advice and investment services to clients, Plaintiff reviews tax returns and sells insurance income products, life insurance, and long-term care insurance through VFS.

In 2008, Plaintiff began registering as a dual resident of Massachusetts and Florida for regulatory purposes related to his broker-dealer registration. Since that year, Plaintiff has registered his Florida residence as an office with FINRA; however, he did not register with state regulators at that time. By 2013, Plaintiff had obtained a Florida driver's license and considered himself a citizen

of Florida. In 2014, around the same time he affiliated with NPC, Plaintiff entered into a stipulation with the Florida Office of Financial Regulation and paid a fine. In the stipulation, Plaintiff admitted that, between January 1, 2009 and November 15, 2013, he had conducted investment advisory business from the state of Florida without registering his Florida office with state regulatory authorities. Plaintiff asserts the failure to register his office with Florida was an error made by the broker-dealer he worked with prior to NPC.

Between 2014 and 2017, the period during which Plaintiff was associated with NPC, Plaintiff spent at least 56% of his time in Florida and in no single year was he in Florida less than 50% of the time.[1] He is unable to provide his location for approximately 18% of the time during that period, so it is also possible he spent even more time in Florida. During those years, Plaintiff was in Massachusetts approximately 10% of the time and in locations other than Florida or Massachusetts approximately 17% of the time. As with the estimate of Plaintiff's time in Florida, one or both of these estimates are likely an undercount given the percentage of his time that cannot be allocated to a known location during the period from 2014 to 2017. In 2016, the year with the lowest percentage of unknown location days, just 9%, Plaintiff was in Florida 66% of the time and in Massachusetts just 9% of the time. However, even in the unlikely event that Plaintiff spent all his undocumented time in Massachusetts, his total time in Massachusetts would not have exceeded 28% over the four years and in the year with the most unknown location days, 29%, he would have spent no more than 35% of his time in Massachusetts.

---

[1] The court has calculated the figures in this paragraph using the calendar included at pages 12-14 of Defendants' Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment (Dkt. No. 145). In 2014, Plaintiff documented spending 53% of his time in Florida, 6% in Massachusetts, 12% in a known third location, and 29% at an unknown location. For 2015 the totals were 50% in Florida, 10% in Massachusetts, 20% in a known third location, and 20% unknown. In 2016, Plaintiff was in Florida 66% of the time, Massachusetts 9% of the time, a known third location 15% of the time, and unknown locations 9% of the time. The totals for 2017 were 53% in Florida, 13% in Massachusetts, 20% in known third locations, and 13% in unknown locations.

Despite Plaintiff spending relatively little time physically in Massachusetts between 2014 and 2017, VFS continued to operate out of an office in Springfield, Massachusetts. Day-to-day operations in the Springfield office, including the maintenance of books and records for FINRA regulatory purposes, were managed by VFS employees physically located in Massachusetts. Plaintiff had complete autonomy regarding the hiring of VFS employees, authority that he delegated to his employee, Tina Chandler. NPC's only requirement was that all employees be fingerprinted to satisfy regulatory compliance requirements. Plaintiff, meanwhile, performed most of his work remotely. He accessed VFS computer systems remotely and communicated with clients by telephone or video conference. He controlled his own scheduling and did not have to report his hours worked to anyone at NPC.

Between 2013 and 2017, NPC was a FINRA-registered independent broker dealer and an SEC-registered investment advisor. NPC was incorporated in Delaware and headquartered in California. NPC had no offices of its own in Massachusetts, but registered offices used by its investment advisors including Plaintiff's Springfield office. NPC also registered to conduct business in Massachusetts with the Secretary of the Commonwealth of Massachusetts and filed corporate income returns reporting Massachusetts income. NPC had similar registrations in many states.

During the period relevant to this litigation, NPC provided back-office services to affiliated investment advisors. These services included compliance, a platform for trade execution, access to financial service products, and the ability to provide investment advisory services through an entity properly registered with FINRA. NPC had employees who worked out of its California office. None of those employees were investment advisors. When investment advisors, including Plaintiff, affiliated with NPC they signed "Independent Contractor's Agreements" with NPC, and NPC treated them as independent contractors. Plaintiff signed his Independent Contractor's Agreement ("Agreement") with NPC in November of 2013. He does not remember where he was when he

signed the Agreement, but the Agreement provides that it is to be "considered in all cases as completed in California" and "subject to California law." The Agreement also provides that it could be terminated by either party at any time simply by providing the other party with written notice.

### III.    SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Here the parties have agreed that there are no material facts in dispute. When ruling on a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). However, "it is well settled that '[t]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 252 (1986)).

### IV.    DISCUSSION

A. MWA Claims (Counts II and III)

Plaintiff begins his analysis by assuming the MWA applies to him, while Defendants urge the court to find the MWA does not apply to Plaintiff because Massachusetts has insufficient ties to the business relationship between Plaintiff and NPC. As neither the NPC nor Plaintiff were citizens of Massachusetts during the relevant period and Plaintiff did most of his work outside of Massachusetts, the court finds it appropriate to begin its analysis as

Defendants suggest, with a determination of whether the MWA applies to the business relationship between NPC and Plaintiff.

As a preliminary matter, the choice-of-law provision in the Agreement does not resolve the question of the applicability of the MWA. The agreement contains a choice-of-law provision applicable to the Agreement itself, but as the provision does not reference statutory causes of action, Massachusetts choice-of-law doctrine will determine whether the MWA applies here. *See Melia v. Zenhire, Inc.*, 967 N.E.2d 580, 590 (Mass. 2012); *Dow v. Casale*, 989 N.E. 2d 909, 913 (Mass. App. Ct. 2013). A state may apply its local law provided "'such application of this law would be reasonable in the light of the relationship of the [S]tate and of other [S]tates to the person, thing or occurrence involved.'" *Dow*, 989 N.E. 2d at 914 (quoting Restatement (Second) Conflict of Laws § 9 (1971) (alterations in original)).

In *Dow*, a case relied upon by both parties, the plaintiff, who lived in Florida, sued his former corporate employer and the employer's chief executive, a Massachusetts resident, asserting his former employer had violated the MWA by not including certain amounts in his final paycheck. The defendants argued plaintiff could not bring his action under the MWA because he "did not reside in Massachusetts and did not perform his work 'primarily' in Massachusetts." *Id.* at 910. The Massachusetts Appeals Court observed that the MWA "is directed at the regulation of employers and does not, in terms, restrict its remedies to employees who live or work in Massachusetts." *Id.* at 913. Therefore, instead of focusing on the location where the employee lived and worked, the Massachusetts Appeals Court looked first to the citizenship of the corporate employer and its chief executive, then turned to the locations of various aspects of the Plaintiff's employment relationship with the employer.

The court observed that both the corporation and its CEO were citizens of Massachusetts and the corporation had its headquarters and all physical facilities in Massachusetts. *Id.* at 914. Additionally, the customers acquired by the plaintiff engaged in business with the Massachusetts corporation, the plaintiff carried business cards with the corporation's Massachusetts contact information, received paychecks issued in Massachusetts, spent time each year working in the corporation's Massachusetts office, exchanged email and phone calls multiple times each week with the corporation's Massachusetts-based CEO, and the plaintiff's employment agreement provided that it would be governed by Massachusetts law. *Id.* The court also found that because the plaintiff was a salesperson who had customers in thirty states and traveled to at least nineteen of those states, he "essentially was a mobile employee" without any particular workplace and, therefore, all of his work, regardless of where it was performed could be "viewed as having 'occurred' in Massachusetts where it benefitted [the employer], no matter where he physically was located from day to day." *Id.* Based on all these factors, the Appeals Court concluded that "as compared to any other State, Massachusetts has by far the most significant relationship not only to [the employer and its CEO] as citizens of the Commonwealth, but also to [the plaintiff's] employment relationship with them." *Id.*

This case, like *Dow*, concerns whether the MWA will apply to a person who resided in Florida and worked from a variety of locations, but the cases have little else in common. Unlike the employer in *Dow*, NPC was not a citizen of Massachusetts. Its headquarters were in California and, other than Plaintiff whose status as an employee is the central dispute in this case, NPC had no Massachusetts employees. NPC did register the Springfield VFS office as a branch office with FINRA and did register to do business in Massachusetts, but these registrations do not establish ties with Massachusetts that are any more significant than its ties with other states. Indeed, NPC made

7

similar filings in Florida due to Plaintiff's use of his Florida home office. Taken together, these facts provide scant basis for finding a significant relationship between Massachusetts and NPC, and certainly any such relationship was less significant than the relationship California had to NPC.

The connection between Massachusetts and the employment relationship between NPC and Plaintiff is similarly tenuous. During the relevant period, Plaintiff was a resident of Florida and spent at least half of his days, likely considerably more, in Florida. NPC issued Plaintiff's commission statements and 1099s from California to Plaintiff's Florida address. Plaintiff, not NPC, set his work schedule and determined the locations from which he worked. Regardless of where he worked, the income he generated benefitted NPC in California. With the exception of periodic, in-person audits, NPC's services were provided from California. Plaintiff did not interact with NPC management or compliance personnel located in Massachusetts or travel to any NPC-sponsored conferences in Massachusetts.

Plaintiff did have consistent ties to a Massachusetts office, regularly communicating with staff and working in that office several times per year, but those employees were VFS employees, not employees of NPC. The ties between Plaintiff and the VFS office in Massachusetts did not serve his employment relationship with NPC; instead, they served Plaintiff's own business interests in VFS. Additionally, the Agreement between Plaintiff and NPC was executed by NPC in California and provided that it would be governed by California law. These facts demonstrate that while Massachusetts had a tenuous connection to the relationship between NPC and Plaintiff, both California and Florida had more significant ties. Given the relatively weak relationship between Massachusetts, NPC, and the employment relationship, application of Massachusetts choice-of-law principles leads this court to conclude that the MWA is inapplicable here.

B.  Remaining Claims (Counts I, IV, V, and VI)

While Plaintiff only moved for summary judgment on his MWA claim, Defendants have moved for summary judgment as to all counts. These include violation of the Federal Fair Labor Standards Act ("FLSA") (Count I), unjust enrichment (Count IV), breach of implied covenant of good faith and fair dealing (Count V), and quantum meruit (Count VI). Even in his opposition to Defendant's motion, Plaintiff has focused on the MWA claims and made only cursory arguments opposing summary judgment as to the other counts. Once Defendants have advanced persuasive arguments that the factual record is undisputed and they are entitled to judgment as a matter of law, the burden shifts back to Plaintiff. *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 5 (1st Cir. 2010) (ruling that an adequate motion for summary judgment shifts to the plaintiff the burden for demonstrating that summary judgment should not enter).

Acts prohibited under the FLSA are listed at 29 U.S.C § 215 and include violations of minimum wage provisions (29 U.S.C. § 206); violations of the overtime law (29 U.S.C. § 207); violations of child labor laws (29 U.S.C. § 212); and retaliation because an employee has complained about other violations (29 U.S.C. § 215(a)(3)). Notably missing from that list is the type of misclassification at issue here.[2] Defendants assert they are entitled to summary judgment on the FLSA misclassification claim because neither the statute nor case law creates a cause of action for situations where a plaintiff argues only that they were misclassified as an independent contractor, not that they were denied minimum wage or overtime pay. In response, Plaintiff identifies neither statutory language nor case law recognizing an independent claim for misclassification. Instead, Plaintiff repurposes Defendants' argument, asserting Defendants' motion falls short because they

---

[2] Under the FLSA, employers are able to designate some employees as exempt from overtime requirements. Courts may refer to claims that an employer improperly designated employees exempt as misclassification claims, but Plaintiff is clearly pursuing a different type of misclassification claim. *See e.g. Crow v. Examworks, Inc.*, 136 F.Supp.3d 16, 27 (D. Mass. 2015).

have not cited a controlling, First Circuit authority, stating that no independent misclassification claim exists.

Summary judgment is appropriate where the moving party is able to demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014). As the moving party, Defendants have asserted there are no contested material facts relevant to Plaintiff's FLSA claim because the FLSA does not create a legal claim for misclassification. In order to avoid summary judgment, Plaintiff is obligated to demonstrate, with record evidence, that he has suffered an injury compensable under the FLSA. As he has failed to do that, summary judgment is appropriate as to the FLSA claim (Count I).

The court now turns to Plaintiff's last three claims – unjust enrichment (Count IV), breach of implied covenant of good faith and fair dealing (Count V), and quantum meruit (Count VI) – all of which are asserted pursuant to Massachusetts common law. As to the breach of covenant claim, Defendants assert that the uncontested material facts establish that NPC met all the contractual obligations set out in the Agreement, the written contract between the parties. Under Massachusetts law, "[t]he covenant of good faith and fair dealing is implied in every contract." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004). This duty concerns the manner in which the parties perform under the contract and it prevents one party from injuring the other party's rights to access the benefits provided in the parties' contract. *Id.* A violation of the covenant "usually requires more than a simple breach," such as "'bad faith' conduct 'implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of the fraud.'" *Targus Group Intern., Inc. v. Sherman*, 922 N.E.2d 841, 853 (Mass. App. Ct. 2010).

Here, Defendants assert that Plaintiff has not alleged even a simple breach of the Agreement, let alone any bad faith conduct, and so cannot succeed on his claim for breach of the

10

implied covenant of good faith and fair dealing. Plaintiff's brief response asserts Defendants breached the covenant by excluding Plaintiff from receiving a particular commission and by selling its business prior the completion of a seven year buy-out term. However, Plaintiff has not identified any section of the Agreement that was breached by NPC's determination regarding that commission or NPC's sale of its business. Plaintiff also has not pointed to record evidence suggesting that NPC's decisions were tainted by any type of bad faith or intention to deprive Plaintiff of his right "to receive the fruits of the [parties'] contract." *Id.* With respect to the unpaid commissions, Plaintiff has not cited any record evidence that NPC's decision not to pay the commission to any of its investment advisors breached the Agreement or that NPC acted in bad faith when it determined that the disputed commissions should not be paid because of the risk of a conflict of interest. Similarly, Plaintiff has cited no record evidence that NPC's decision to sell its business and terminate its business relationship with its investment advisors, including Plaintiff, breached the Agreement or was made in bad faith or for an improper purpose. The Agreement explicitly allowed for termination by either party at any time and the covenant of good faith and fair dealing cannot be used to create new rights or impose new duties on a party beyond those contained in the contract. *Uno*, 805 N.E.2d at 965-66. Where, as here, there is an allegation only that the covenant of good faith and fair dealing has been breached, but no record evidence supports a finding either that there was a breach or that NPC acted in bad faith, Defendants are entitled to summary judgment on Count V.

Finally, Defendants are entitled to summary judgment on Plaintiff's claims of unjust enrichment (Count IV) and quantum meruit (Count VI). These counts represent alternative theories of recovery that can only be awarded where no express contract covers the matter. *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) ("It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment."); *see also In re Lupron Mktg. and*

*Sales Practices Litig.*, 295 F. Supp. 2d 148, 182 (D. Mass. 2003) (ruling there can be no action for unjust enrichment when there is a contract governing the parties' relationship); *York v. Zurich Scudder Inves., Inc.,* 849 N.E.2d 892, 901 (Mass. App. Ct. 2006) ("It is well settled that quantum meruit relief may not be granted where an express contract covering the matter exists."). Here, there is no dispute that the Agreement governed the relationship between the parties, providing Plaintiff with adequate legal remedies. Additionally, the court notes that Plaintiff has not even articulated an argument as to how these particular claims would survive Defendants' motion for summary judgment.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 137) is denied and Defendants' Motion for Summary Judgment is granted. (Dkt. No. 140). The Clerk is directed to enter judgment for Defendants, and this case may now be closed.

It is So Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge